# EL PASO PRODUCTION COMPANY and
Swift Energy Company  *v.*  James H. BLANCHARD, Jr.

06-1107                                    269 S.W.3d 362

Supreme Court of Arkansas
Opinion delivered December 6, 2007

[Rehearing denied January 17, 2008.]

*Kinard, Crane & Butler, P.A.*, by: *David F. Butler; Lemle & Kelleher, LLP*, by: *Joseph L. Shea, Jr.*, for appellants.

*Bell Law Firm*, by: *Ronny J. Bell* and *Karen Talbot Gean*, for appellee.

JIM GUNTER, Justice. Appellants, El Paso Production ("El Paso") and Swift Energy Company ("Swift") appeal an order of the Columbia County Circuit Court awarding damages to Appellee James H. Blanchard, Jr. ("Blanchard") resulting from Appellants' seismic operations conducted upon surface lands owned by Blanchard. We affirm in part, reverse in part, and remand for a recalculation of actual damages.

## I. Facts

Blanchard, along with his mother, Audrey Palmer Blanchard, and others ("Blanchard family"), owned eighty acres of land in Columbia and Lafayette Counties, including an undivided

one-half interest in the mineral estate underlying the surface property. Blanchard subsequently acquired the surface interest of his family in the property. North Central Oil Corporation ("North Central") owned the other one-half interest in the mineral estate underlying the Blanchard property.

On February 21, 1997, the Blanchard family entered into an oil-and-gas lease with Swift ("Swift lease") in which they leased their mineral interest in the Blanchard property. The lease contained the following provision:

> This lease may not be assigned or subleased, in whole or in part, without the express written consent of James H. Blanchard, Jr. which consent shall not be unreasonably withheld. Any assignment or sublease granted by Lessee without the express written consent of James H. Blanchard, shall be null and void.

Further, the lease allowed for timber damages to be "appraised by a licensed forester of Lessor's choice with Lessee being responsible for said appraised damages plus a reasonable forester's fee associated therewith."

On August 20, 1997, North Central granted to Sonat Production Company ("Sonat"), El Paso Production Company's predecessor in interest, an oil-and-gas lease ("El Paso lease") covering its one-half interest in the mineral estate that granted Sonat the exclusive right to explore the minerals on the Blanchard property.[1] This lease includes seismic testing. Both Swift and El Paso were companies engaged in the exploration and development of oil and gas. Swift's focus was to the west of the Blanchard property, and El Paso's focus was toward the east of the property. For years, El Paso actively developed the Springhill/North Shangaloo-Red Rock Field located to the east of the Blanchard property.

In the summer of 1997, El Paso undertook a seismic shoot several miles to the east of the property. El Paso evaluated the seismic information acquired from the shoot and proposed well locations. El Paso also approved another seismic shoot designated as the Springhill West project, which was to the east of the Blanchard property. Additionally, El Paso pursued a seismic shoot to the west of the Blanchard property called the Teague Branch Prospect.

---

[1] For the sake of clarity, all references to Sonat will be to El Paso.

On October 10, 1997, El Paso and Swift entered into the Seismic Acquisition Agreement whereby Swift received permission from El Paso for Swift's seismic shoot over acreage leased by El Paso in the Teague Branch Prospect. In return, Swift agreed to license data acquired by Swift to El Paso for the price of $1,750 per mile, and Swift authorized El Paso to shoot seismically over leases held by Swift in Springhill West. These leases included the Blanchard lease.

El Paso then contracted with Boone Geophysical, Inc. ("Boone") to undertake the Springhill West seismic shoot, and Boone filed an application with the Arkansas Oil and Gas Commission ("Commission"). On February 13, 1998, the Commission issued a permit to El Paso and Boone to conduct the seismic operations contemplated under the application. In a memo dated March 3, 1998, Mike Hamlin, an independent contractor working for Boone, advised Allan Schlosser, an El Paso geophysicist, of Blanchard's involvement. Hamlin offered Blanchard $400 for surface damages relating to the four seismic shoots. Blanchard advised Hamlin that his lessee, Swift, had the exclusive right to permit the seismic operations, and he could not give such permission. Blanchard told Hamlin that he would not do business with El Paso as long as David Hamilton was employed by El Paso. When Blanchard refused to grant El Paso permission to conduct the seismic exploration, El Paso requested permission from Swift.

On April 14, 1998, Swift and El Paso entered into a letter agreement in which El Paso was granted permission by Swift to conduct seismograph data acquisition upon Blanchard's property. On April 15, 1998, El Paso forwarded to Blanchard the required notice of intention to engage in seismic operations upon the Blanchard property. The letter makes no assertion that the notice was given on behalf of Swift. The notice was forwarded by certified mail, return receipt requested, as required by the lease. The Blanchards refused Boone Geophysical and El Paso access to the Blanchard property to conduct the seismic operations.

On May 21, 1998, El Paso filed a complaint for injunctive relief against Blanchard and others to conduct seismic operations pursuant to the terms of the North Central lease agreement. The circuit court granted the temporary restraining order on May 21, 1998, and it was served upon Blanchard on May 22, 1998.

El Paso undertook a seismic shoot over the Blanchard property in June of 1998. In a letter dated June 16, 1998, Blanchard provided to Swift an appraisal of the amount owed by

Swift to Blanchard for damages pursuant to the Swift lease. According to Blanchard, he sustained $173.72 in actual damages in connection with the seismic exploration. He also made a claim of $1,705 for his "disturbance." He further alleged that Swift failed to give notice of the operations and violated the terms of the lease agreement. He sought $3,757.44 in addition to the $1,878.72 for the invoice of the appraisal.

On July 21, 1998, Blanchard's attorney sent a letter to Swift seeking $5,000 in settlement. In a letter dated July 22, 1998, Swift offered to pay the total lease amount claim of $1,878.72 plus any attorneys' fees. Further, Swift disputed the claims regarding its undertaking the seismic shoot or failing to send notice. Swift also notified Blanchard that El Paso had paid the appraisal fee. Swift requested a release in return for payment. El Paso spent approximately $240,000 conducting the seismic shoot that yielded poor seismic information.

On March 4, 1999, Blanchard complained to the Arkansas Oil and Gas Commission that El Paso and Boone had violated its Rule B-42. The Commission opted not to act on Blanchard's complaint because the Commission's jurisdiction had been pre-empted by the circuit court's involvement.

Three cases concerning the matter were consolidated, and prior to trial, by orders dated July 12, 2000, and July 1, 2001, the circuit court granted motions for partial summary judgment in favor of Blanchard. Additionally, prior to trial, Blanchard withdrew a claim for punitive damages arising out of a trespass claim in order to recover damages based upon unjust enrichment.

The matter was presented for trial on December 8, 2004. On May 19, 2006, the circuit court entered its findings of fact and conclusions of law, making the following rulings: (1) affirming its prior order of July 9, 2001, granting partial summary judgment in favor of Blanchard on the issue of Swift violating the terms and conditions of its lease agreement with Blanchard when it assigned to El Paso the right to conduct seismic exploration on the Blanchard property; (2) that Blanchard did not unreasonably withhold his consent to an assignment from Swift to El Paso; (3) affirming the prior July 12, 2000 order that El Paso was required to obtain consent prior to undertaking any seismic operations on the Blanchard property; (4) awarding Blanchard the liquidated damages due to him under the lease agreement in the amount of

$3,757.44; (5) that Blanchard established a valid claim for damages against El Paso for tortious interference of a valid contractual relationship; and (6) that Blanchard was not entitled to punitive damages. On June 30, 2006, the circuit court entered an order awarding judgment to Blanchard in the amount of $3,757.44 as compensatory damages for breach of contract, $3,757.44 as compensatory damages for tortious interference, and $260,000 as compensatory damages "for the amount by which El Paso was unjustly enriched by its unlawful trespass upon [the] Blanchard land[.]" On July 14, 2006, El Paso filed its notice of appeal.

On September 4, 2007, we granted Blanchard's motion to reschedule oral argument, and oral argument was set for November 8, 2007. From the circuit court's June 30, 2006 order, which references the May 19, 2006 order, El Paso now brings its appeal.

## II. Standard of review

In bench trials, the standard of review on appeal is not whether there is substantial evidence to support the finding of the circuit court, but whether the judge's findings were clearly erroneous or clearly against the preponderance of the evidence. *Omni Holding and Development Corp. v. C.A.G. Investments, Inc.*, 370 Ark. 220, 258 S.W.3d 374 (2007). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a firm conviction that an error has been committed. *Id.* Facts in dispute and determinations of credibility are within the province of the fact-finder. *Id.*

## III. Blanchard's trespass claim

For its first point on appeal, El Paso argues that the circuit court erred in finding that it trespassed on the Blanchard property. In so doing, El Paso makes three specific arguments. First, El Paso contends that the circuit court erroneously interpreted the Commission's Rule B-42 to require permission of all surface owners prior to the undertaking of a seismic shoot. Second, El Paso asserts that Rule B-42 is unconstitutional as applied. Third, El Paso claims that the circuit court erroneously found that the Swift permit, which authorized El Paso to undertake the seismic shoot, was "null and void" because it, in effect, was an assignment without Blanchard's written consent. El Paso maintains that this permit was not in breach of the Swift lease.

In response, Blanchard argues that the circuit court properly ruled that El Paso trespassed when it conducted seismic operations on his property. Blanchard maintains that El Paso's actions constituted a trespass because it did not have his permission to enter his surface estate as required by Rule B-42 of the Commission.

### A. Rule B-42

The crux of El Paso's first argument is that, because it is the owner of a mineral leasehold estate, which is situated under Blanchard's surface estate, it may reasonably use the surface for the purpose of developing the minerals. It is well settled in Arkansas that a mineral owner is properly considered a "landowner." *Schnitt v. McKellar*, 244 Ark. 377, 386, 427 S.W.2d 202, 208 (1968). The owner of a mineral estate has the right to reasonable use of the surface for developing minerals, and the mineral estate is described as the "dominant" estate while the surface estate is depicted as the "subservient estate." *See, e.g., Diamond Shamrock Corp. v. Phillips*, 256 Ark. 886, 511 S.W.2d 160 (1974) (holding that the owner of a mineral estate has the right to go upon the surface estate to drill wells and occupy the surface to the extent that it is reasonably necessary). In other words, the mineral owner or his lessee has a right of reasonably necessary surface usage to explore and develop the mineral estate. *See, e.g., Arkansas Louisiana Gas Co. v. Wood*, 240 Ark. 948, 403 S.W.2d 54 (1966). In *Wood*, we stated:

> [A]n oil and gas lease gives with it the right to possession of the surface to the extent *reasonably necessary* to enable a lessee to perform the obligations imposed upon him by the lease. This includes the right to enter upon the premises and use so much of it, and in such manner, as may be reasonably necessary to carry out the terms of the lease and [to] effectuate its purpose.

*Id.* at 950, 403 S.W.2d at 55-56 (emphasis added). In *Wood*, we held that, in addition to sustaining $1500 damages to his property, the lessee's use of the landowner's stock pond was not reasonably necessary. *Id.*

Notwithstanding this well-established precedent, Blanchard relies upon Rule B-42 of the Arkansas Oil and Gas Commission, which provides:

> No entry shall be made by the permittee upon the lands upon which such seismic operations are to be conducted without the permittee having first secured a permit from the landowner authorizing such operations to be conducted.

*Id.*[2] The Commission's statutory authority for implementing such a rule is found at Ark. Code Ann. § 15-71-110 (Supp. 2007).

In light of this regulation, we note the two paragraphs from El Paso's application with the Arkansas Oil and Gas Commission to conduct seismic operations read as follows:

> The undersigned Applicant acknowledges by the execution hereof that this Application is filed for purposes of conforming with the requirements of Act 1991, No. 5, and that any operation which Applicant herein is granted a permit to perform shall be subject to and in conformity with the provisions of said Act and all rules, regulations, and orders of the Arkansas Oil and Gas Commission applicable thereto.
>
> Applicant further agrees that it shall neither enter nor permit the entry upon any lands for the purpose of conducting such seismic operations without having first secured a valid permit or permits from the owner or owners thereof granting Applicant herein the right of entry.

With these principles in mind, we turn to the present case. Here, the circuit court, in its May 22, 2006 order, referenced its July 31, 2000 order in which the court ruled that the Blanchards owned the entire surface estate of the land at issue, as well as an undivided portion of the mineral estate lying under their surface estate. The court also ruled that El Paso was an owner of a mineral leasehold estate under the Blanchard property. The court further ruled that Rule B-42 "specifically sets out the procedures which those desiring to perform seismic operations must follow."

In construing the language of Rule B-42, which was the regulation at the time of the filing of the lawsuit, the "permittee" must gain permission from the "landowner" before seismic operations are conducted on the land. Given a plain reading of the Commission's Rule B-42, the "landowner" equals the surface owner. Here, the surface owner is Blanchard. Thus, we hold that, notwithstanding El Paso's right to explore as a result of its one-half mineral rights, which flow directly from North Central to El Paso as authorized by the El Paso lease, El Paso nevertheless violated Rule B-42 by failing to obtain Blanchard's consent, as required by Rule B-42.

---

[2] This rule has since been amended.

Further, we hold that El Paso's conducting seismic activity was "reasonably necessary" under *Wood, supra,* because of its authorization to conduct its operations as a one-half mineral-rights owner. *See also Musser Davis Land Co. v. Union Pacific Resources,* 201 F.3d 561 (5th Cir. 2000) (holding that seismic exploration is a generally accepted practice that was encompassed in the right to explore).

## B. Constitutionality of Rule B-42

We now consider El Paso's arguments concerning the constitutionality of Rule B-42. The United States Supreme Court explained in *Agins v. Tiburon,* 447 U.S. 255 (1980), that a zoning regulation amounts to a constitutional taking only if "the ordinance does not substantially advance a legitimate state interest," or it "denies an owner economically viable use of his land." Similarly, in *National By-Products, Inc. v. City of Little Rock,* 323 Ark. 619, 916 S.W.2d 745 (1996), we held that a municipality "takes" a person's land only when the regulation "substantially diminishes the value of the land." In *Lingle v. Chevron U.S.A.,* 544 U.S. 528 (2005), the United States Supreme Court later set forth a consideration of the following factors, which include the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations" and " 'the character of the governmental action' — for instance whether it amounts to a physical invasion or instead merely affects property interests through 'some public program adjusting the benefits and burdens of economic life to promote the common good' . . . [.]" *Id.* at 538-39 (citing *Penn Central Transp. Co. v. New York City,* 438 U.S. 104 (1978)).

At the outset, we note that El Paso filed its notice of appeal on July 14, 2006, in which El Paso gave notice of appealing the June 30, 2006 judgment, as well as "all rulings preceding the judgment which were adverse to the Defendants/Appellants including but not limited to the court's 'Order Denying Motion to Dismiss,' filed on March 12, 2004, which raises questions as to the constitutionality of Rule B-42 of the Arkansas Oil and Gas Commission as applied[.]" In the March 12, 2004 order denying El Paso's motion to dismiss, the court states that the motion is denied "for the reasons set forth and cited in Defendant/Counterclaimant's Response and supporting brief and oral arguments to this [circuit] court." According to Blanchard's

brief in response to El Paso's motion to dismiss, Rule B-42 is not an unconstitutional taking without just compensation. Thus, we consider the arguments.

■ We first note that when considering the validity of a regulation, we must give the regulation the same presumption of validity as a statute. *Arkansas Residential Assisted Living Ass'n, Inc. v. Arkansas Health Services Permit Comm'n*, 364 Ark. 372, 377, 220 S.W.3d 665, 668 (2005). With the *Agins* test in mind, we turn to the present case. First, we have noted that the United States Supreme Court has set aside the first prong of the *Agins* test. *See Craft v. City of Fort Smith*, 335 Ark. 417, 984 S.W.2d 22 (1998); hence, we will not address the "substantially advances" prong in *Agins*. Second, under the viable-use prong, we must determine whether Rule B-42 denies an owner an economically viable use of his interest in the land. Here, only seismic activity was prohibited without the express permission of the landowner. Similarly, under a *Lingle* analysis, Rule B-42 does not impact El Paso economically, as it is not prohibited from exploring the mineral estate in other capacities, such as drilling. For these reasons, we agree with the circuit court's rulings that Rule B-42 is constitutional as applied.

### C. Assignment vs. license

Next, we must determine whether El Paso's entrance upon Blanchard's property, pursuant to the April 1998 permit, was a license or an assignment, which the Swift lease prohibited. El Paso argues that Swift did not grant an assignment or sublease, but rather Swift's seismic permit was a license. In response, Blanchard argues that licenses are not assignable, and therefore, Swift did not have a license. Further, Blanchard maintains that under the lease agreement, Swift did not have the authority to grant a right without Blanchard's consent.

We explained the difference between a license and a lease in *Harbottle v. Central Coal & Coke Co.*, 134 Ark. 254, 203 S.W. 1044 (1918), where we stated:

> There is a marked difference between a license and a lease. Under the lease, the right of possession against the world is given to the tenant, while a license creates no interest in the land, but is simply an authority or power to use in some specific way.

. . . .

> A license in respect to real estate is an authority to do a particular thing upon the land of another without possessing an estate therein. The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession as against all the world, including the owner, in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license.

*Id.* at 1046 (citations omitted). However, "[a] license not being assignable, an attempted assignment by the licensee of his rights thereunder has been regarded as bringing the license to an end[.]" Tiffany Real Property, Sec. 837 (2004).

Here, the Swift lease between Blanchard and Swift specifically provided that the rights granted to Swift were not subject to assignment or sublease, in whole or in part, without the express written consent of Blanchard. In paragraph ten of Exhibit A of the Blanchard–Swift lease, the following language is:

> This lease may not be assigned or subleased, in whole or in part, without the expressed written consent of James H. Blanchard, Jr. which consent shall not be unreasonably withheld. Any assignment or sub-lease granted by lessee without the expressed written consent of James H. Blanchard, Jr. shall be null and void.

However, we agree with El Paso's argument that no assignment occurred. El Paso had the right to license seismic tests by way of its own lease of an undivided one-half interest in minerals under Blanchard's surface. El Paso had the right to explore, including seismic operations independent of Blanchard, who owned the other one-half mineral interest. Further, under *Bonds, supra,* El Paso did not breach the non-assignability clause of the Swift lease, particularly considering that El Paso was not a party to the Swift lease.

As to the one-half mineral interest owned by Blanchard, Swift did not assign any right that was barred by the non-assignment clause in the lease. Under its right to explore given in the lease, Swift could license another party to conduct seismic operations without violating the agreement. El Paso acquired no interest in Blanchard's land through Swift's license, but only acquired the privilege to occupy the Blanchard property for the specific purpose of conducting seismic tests. Therefore, we hold that the permission to conduct seismic operations held by El

Paso by way of Swift was a license and was not an assignment. *Harbottle, supra.* Accordingly, we reverse the circuit court's rulings on this point.

### IV. Unjust-enrichment damages

For the second point on appeal, El Paso argues that the circuit court erred in awarding damages for unjust enrichment solely on the basis of a showing of trespass. Specifically, El Paso asserts that Blanchard expressly waived his trespass action prior to trial and elected to sue in assumpsit. El Paso asserts that Blanchard is not entitled to the award based upon unjust enrichment because Blanchard did not satisfy the requirements of an unjust-enrichment claim for the following reasons: (1) El Paso was not enriched, and (2) Blanchard did not suffer a compensable loss.

Blanchard responds by arguing that the circuit court's award of damages for unjust enrichment was proper. Specifically, Blanchard contends that El Paso was unjustly enriched by its wrongful act of trespassing on the Blanchard property to conduct seismic exploration without the required permission.

To find unjust enrichment, a party must have received something of value, to which he or she is not entitled and which he or she must restore. *Hatchell v. Wren,* 363 Ark. 107, 117, 211 S.W.3d 516, 522 (2005). There must also be some operative act, intent, or situation to make the enrichment unjust and compensable. *Id.; Dews v. Halliburton Indus., Inc.,* 288 Ark. 532, 708 S.W.2d 67 (1986). One who is free from fault cannot be held to be unjustly enriched merely because he or she has chosen to exercise a legal or contractual right. *Rigsby v. Rigsby,* 356 Ark. 311, 149 S.W.3d 318 (2004); *Guaranty Nat'l Ins. Co. v. Denver Roller, Inc.,* 313 Ark. 128, 854 S.W.2d 312 (1993). In short, an action based on unjust enrichment is maintainable where a person has received money or its equivalent under such circumstances that, in equity and good conscience, he or she ought not to retain. *Merchants & Planters Bank & Trust Co. v. Massey,* 302 Ark. 421, 790 S.W.2d 889 (1990); *Frigillana v. Frigillana,* 266 Ark. 296, 584 S.W.2d 30 (1979).

Further, in *Pro-Comp Management, Inc. v. R.K. Enterprises,* 366 Ark. 463, 237 S.W.3d 20 (2006), we stated:

> Unjust enrichment is an equitable doctrine. It is the principle that one person should not be permitted unjustly to enrich himself at the expense of another, but should be required to make restitution

of or for property or benefits received, retained, or appropriated, where it is just and equitable that such restitution be made, and where such action involves no violation or frustration of law or opposition to public policy, either directly or indirectly.

*Id.* (citations omitted).

■ With these principles in mind, we turn to the present case. Here, there was testimony at trial that drilling a well would have cost El Paso $500,000, and by El Paso's own calculation, it spent $240,000 in conducting seismic operations. Thus, the circuit court awarded Blanchard $260,000 in assumpsit damages by subtracting $240,000 from $500,000. However, we conclude that El Paso's paying Blanchard $260,000 in unjust-enrichment damages was too speculative, particularly in light of the fact that the $500,000 was not substantiated and neither El Paso nor Swift had the intent to drill. Thus, for these reasons, we reverse the circuit court's award of $260,000 to Blanchard.

### V. *Tortious interference*

For its third point on appeal, El Paso argues that it did not tortiously interfere with the Swift lease. Specifically, El Paso claims that it could not and did not intend for Swift to breach the Swift lease, that El Paso did not induce Swift to do anything, there were no additional resultant damages, and El Paso's conduct was not improper.

Blanchard contends that the circuit court correctly determined that El Paso tortiously interfered with Swift's lease from Blanchard. Blanchard asserts that Swift had intent to grant El Paso permission to conduct the seismic operations on the Blanchard property and to refuse to pay Blanchard damages unless he agreed to release El Paso from further liability. Further, Blanchard maintains that El Paso induced Swift to breach its lease from Blanchard, and as a result, Blanchard was damaged by El Paso's tortious interference with his lease to Swift.

We have stated that to establish a claim of tortious interference with business expectancy, a plaintiff must prove: (1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship. or

expectancy has been disrupted. *Stewart Title Guaranty Co. v. American Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005). In addition to the above requirements, we have also stated that, for an interference to be actionable, it must be improper. *Id.*

Guided by these legal principles, we turn to the present case. Here, the circuit court made the following rulings:

> (1) That a valid contractual relationship existed between Blanchard and Swift; (2) that El Paso had knowledge of the contractual relationship between Blanchard and Swift; (3) that El Paso intentionally interfered with the Blanchard-Swift contractual relationship by inducing Swift to breach its contractual relationship with Blanchard; (4) that Blanchard was damaged directly as a result of El Paso's interference with a valid contractual relationship between Blanchard and Swift; (5) that El Paso's action was improper for the following reasons: (a) El Paso's conduct was egregious in it knew that Blanchard would not consent to an agreement for Sonat to conduct seismic operations on his property, and it knew that Blanchard's position was that he had granted that right to Swift but that Swift could not assign it to Sonat or anyone else; in order to defeat the clear language of Blanchard's lease with Swift, Sonat induced Swift, for valuable consideration, to grant Sonat a permit to conduct said seismic operations; (b) El Paso's motives were purely pecuniary and selfish; (c) El Paso clearly interfered with the right of Blanchard to control, as he had the right to do, the development of his property for oil and gas; (d) See (b) above; (e) there are no social interests which should be protected by the manner in which El Paso conducted its operation in this case; (f) El Paso's interference with the Blanchard-Swift lease was direct and not remote; (g) the relations between Blanchard and El Paso were estranged and unfriendly.

■ We disagree with the circuit court's rulings for the following reasons. At the outset, we note that because there was no breach of contract, there can be no tortious interference. For these reasons, we reverse the circuit court's ruling with respect to El Paso's alleged tortious interference with the Swift lease.

## VI. Damages

For its fourth point on appeal, El Paso argues that if Blanchard is allowed to recover, then his award should be reduced. Specifically, El Paso contends that the circuit court was required to reduce Blanchard's recovery to reflect his percentage interest in the Blanchard property.

Blanchard argues that there is no basis for any reduction of his damage award. In response to El Paso's contention that Blanchard should receive a percentage according to his interest in the property, Blanchard claims that he should receive one-hundred percent of the damages because he is the surface owner.

■ Here, the circuit court awarded Blanchard the following damages: (1) $3,757.44 in compensatory damages for Swift's breach of contract; (2) $3,757.44 for El Paso's tortious interference with contractual relations; and (3) $260,000 as compensatory damages for El Paso's unjust enrichment. Based upon the above analyses and holdings, we reverse the following circuit court's rulings with respect to damages. First, we hold that Swift did not breach its contract with Blanchard because of its right to grant a license, and we reverse the award of $3,757.44 in compensatory damages for breach of contract. Second, because we hold that El Paso did not tortiously interfere with Swift's lease, we reverse the award of $3,757.44. Third, as we stated earlier, we reverse the circuit court's award of $260,000 in unjust-enrichment damages. Lastly, we remand for a determination of actual damages to Blanchard's property.

## VII. Cross-appeal

For his first point on cross-appeal, Blanchard argues that the circuit court erred in finding that Blanchard failed to prove a portion of his damages with respect to his claim for tortious interference with contractual relations. El Paso responds, arguing that Blanchard is not entitled to further recovery for his unjust-enrichment claim.

In civil cases where the trial judge, rather than a jury, sits as the trier of fact, the correct standard of review on appeal is not whether there is any substantial evidence to support the finding of the court, but whether the judge's findings are clearly erroneous or clearly against the preponderance of the evidence. *McGraw v. Jones*, 367 Ark. 138, 238 S.W.3d 15 (2006).

Here, the circuit court ruled that Blanchard failed to produce evidence as to the proper amount of damages. At trial, Blanchard testified that he would have agreed to less than the cost of drilling a well. The cost of drilling a well is approximately $500,000. Thus, the damages would have been too speculative. We have said that although recovery will not be denied merely

because the amount of damages is hard to determine, damages must not be left to speculation and conjecture. *Vowell v. Fairfield Bay Community Club, Inc.*, 346 Ark. 270, 58 S.W.3d 324 (2001). For these reasons, we cannot say that the circuit court erred.

In his second point on cross appeal, Blanchard argues that the circuit court erroneously failed to award punitive-damage awards. We must determine whether the judge's findings are clearly erroneous or clearly against the preponderance of the evidence. *McGraw, supra.*

■■ The circuit court set forth in its findings its rationale for its refusal to award punitive damages. First, it stated that El Paso obtained legal advice from its own legal counsel that it could conduct the seismic operations under the permit. Second, it obtained a temporary restraining order before moving onto Blanchard's property. Based upon these reasons, the circuit court concluded that El Paso was acting in its own fair interest based upon reasonable economic and business considerations. *See, e.g., Robertson Oil Co. v. Phillips Petroleum Co.*, 14 F.3d 373 (8th Cir. 1993). Based upon these rulings, as well as our well established standard of review, we do not disturb the circuit court's rulings on this point.

Affirmed in part; reversed and remanded in part; affirmed on cross-appeal.

DANIELSON, J., concurs in part and dissents in part.

PAUL E. DANIELSON, Justice, concurring in part; dissenting in part. While I concur with a large part of the majority opinion and the holding to reverse the order of the circuit court, I do not believe that El Paso violated Rule B-42. Furthermore, while the majority remands "for a determination of actual damages to Blanchard's property," it is my opinion that Blanchard chose to waive damages for the tort of trespass when he instead sought damages below based on unjust enrichment, as noted by the circuit court in its findings of fact and conclusions of law. Therefore, I would dismiss the case as to any damages claimed against El Paso for trespass.

For clarification purposes, I begin with a review of the most basic facts. El Paso and Swift were both companies engaged in the exploration and development of oil and gas. Blanchard was the surface owner and owner of a one-half undivided mineral interest in the land relevant to this lawsuit. North Central was the owner

of the other one-half interest in the mineral rights on Blanchard's property. Swift had entered into an oil and gas lease with Blanchard on February 21, 1997, that granted it the right to develop the property for oil and gas, including the right to use seismic exploration. By virtue of an oil and gas lease from North Central, dated August 20, 1997, El Paso also held a leasehold interest in one-half of the mineral estate.

After some prior dealings with Swift on Blanchard's property, El Paso learned, around February of 1998, that one of its projects would involve some of Blanchard's property and approached Blanchard to request a permit for these seismic shoots. Blanchard denied that permit, advising El Paso that his lessee, Swift, had the exclusive right to permit seismic operations, and he could not give such permission. Therefore, El Paso sought a permit from Swift, which Swift agreed to. However, Blanchard denied El Paso access to the property. Under advisement of their in-house counsel, El Paso obtained a temporary injunction against Blanchard for access to the land, which was served upon Blanchard on May 22, 1998. El Paso proceeded and conducted the seismic explorations on the property. Thereafter, Blanchard asserted that Swift had breached its lease by granting the permit to El Paso and that El Paso had wrongfully trespassed by conducting the seismic exploration. It should be noted that the court order obtained by El Paso was never appealed.

It is my opinion that El Paso did everything reasonable to attempt to comply with Rule B-42. First, El Paso approached Blanchard, the surface owner, to get a permit. Blanchard informed El Paso that he could not give such permission because his lessee, Swift, had the exclusive right to permit the seismic operations. The only choice that El Paso, or any other third party seeking a seismic permit, had was to approach Swift. Blanchard effectively sent El Paso to Swift himself. Swift then granted permission for El Paso to conduct the seismic operations, yet Blanchard still denied El Paso access to the property. El Paso went so far as to get a court order to gain legal access to the land. All of these facts are consistent with a finding that El Paso complied with Rule B-42. The right of exploration was not Blanchard's, therefore he had no right to keep El Paso from exploring for minerals.

This was a situation in which the surface owner attempted to hold up the owner of the mineral rights from exploration and used Rule B-42 to do so. Rule B-42 has since been changed by the

Arkansas Oil and Gas Commission, now requiring only notice to a surface owner before certain mineral exploration takes place. Rule B-42 of the Arkansas Oil and Gas Commission now provides in pertinent part:

> No entry shall be made by any person or entity upon the lands upon which such seismic operations are to be conducted without the person or entity having first given *notice* as provided in Ark. Code Ann. (1987) § 15-72-203 to the surface owner of the lands upon which such operations are to be conducted.

(Emphasis added.)

For the above reasons, I would hold that El Paso did not violate Rule B-42 and, because Blanchard waived his option to sue based on the tort of trespass, I would dismiss any claims for damages against El Paso for trespass.