HARBOTTLE *v.* CENTRAL COAL & COKE COMPANY.

Opinion delivered May 6, 1918.

1. APPEAL AND ERROR—JURISDICTION—WAIVER.—Defendant filed a demurrer objecting to equity jurisdiction, but before the same was ruled upon he filed a cross-bill asking for affirmative relief and upon the issues thus joined proceeded to final adjudication. *Held,* all objections to jurisdiction were waived.

2. LEASE—DEFINITION.—No specific words are necessary to describe the relation of lessor and lessee, but words must be used to create a lease which have the effect to divest the owner or lessor of the possession and right to the possession, and which invests the lessee with the subject matter of the lease for the term contemplated by the contract, whether long or short.

3. MORTGAGES—FORECLOSURE—RIGHT OF LICENSEE OF MORTGAGOR.—A. granted to appellant a license to go upon certain land and mine certain coal in a certain manner. The land was subject to mortgage and was sold under foreclosure. *Held,* appellant, being merely the licensee of the mortgagor, had no interest in the land and no right of redemption.

Appeal from Sebastian Chancery Court, Greenwood District; *W. A. Falconer,* Chancellor; affirmed.

*Tellier & Biggs* and *Fred L. Satterfield,* for appellant.

1. The court was without jurisdiction, as plaintiff has a complete remedy at law. Plaintiff does not allege a previous establishment of a title at law nor that defendant is insolvent. Nor is irreparable injury alleged. 3 Pittsb. 204, 210; 67 Ark. 413; 81 *Id.* 115; 75 *Id.* 286; 92 *Id.* 118; 93 *Id.* 93; 77 *Id.* 527; 196 S. W. 483; 22 L. R. A. 233; 22 Cyc. 818; 1 Pom. Eq. Jur., par. 252; 3 Md. 489; 57 N. H. 153; 44 Am. Dec. 412; 31 Ark. 473; 33 *Id.* 633; 4 *Id.* 302; 72 So. 391; 134 *Id.* 278; 195 *Id.* 288. Insolvency must be alleged. 67 Ark. 413; 75 *Id.* 286; 81 *Id.* 115; 92 *Id.* 118; 93 *Id.* 92; 77 *Id.* 527.

2. The contract was a lease. 150 Ill. 344; 37 N. E. 937; 57 Mo. App. 11; 8 Barr. (Pa.), 272; 22 Hun, 392; 35 Pa. (11 Casey), 287; 107 Pa. 66; 37 Pac. 591; 91 Va. 297; 23 S. E. 303; 6 A. & E. Enc. L. 884; 22 Ind. 122; 47 Md. 295; 1 Tiffany, Real Prop. 82, 91; Tiedeman, Real Prop. (3 ed.), 164; 9 Pa. Co. Ct. Rep. 56.

3. The lease passed the legal title to Harbottle. 32 Ark. 478; 43 *Id.* 488; 69 *Id.* 95; 87 *Id.* 502. The lease was duly recorded.

4. The mortgagee, the purchasers and the world had notice of appellant's rights under his recorded lease. Actual possession is notice. Reeves, Real Prop. 572; Warville on Abst. 689; 54 Ark. 424; 33 *Id.* 465. See also 94 Ark. 503; 39 Cyc. 1762-3; 115 N. E. 721; 44 Ark. 517; 14 *Id.* 294; 101 *Id.* 169.

5. Harbottle was not a party to the foreclosure suit and not bound. 54 Ark. 275; 34 *Id.* 391; 23 Cyc. 812-13; 28 Ark. 171; 84 *Id.* 521; 74 Ark. 138; Tiedeman, Real Prop. (3 ed.), par. 271.

6. Harbottle is a junior encumbrancer and has the right to redeem. 38 Pac. 493; 54 Kan. 403; 18 N. W. 94; 31 Minn. 368; 2 Jones on Mortg., § 1055; 11 A. & E. Enc. Law (2 ed.), 214-15; 64 Ark. 576; 74 *Id.* 138; 84 *Id.* 521-6; 195 S. W. 1067; Wiltsie on Mortg., § 1180.

*Rose, Hemingway, Cantrell, Loughborough & Miles,* for appellees.

1. The demurrer was abandoned. 27 Ark. 235; 90 *Id.* 86; 95 *Id.* 405. By filing a cross-bill defendant conferred jurisdiction. 48 Ark. 312; 56 *Id.* 93; 77 *Id.* 570; 81 *Id.* 163; 96 *Id.* 524; 100 *Id.* 28.

2. The judgment is right on the whole record. 59 Ark. 215; 62 *Id.* 431; 67 *Id.* 426; 100 *Id.* 212.

3. Injunction lies in this case, and is the proper remedy. 33 Ark. 633; 67 *Id.* 413; 75 *Id.* 286; 38 S. E. 71; 19 So. 163; 48 N. W. 1025; 10 So. 848; Beach on Inj., § 1155; 113 U. S. 537; 25 Atl. 427; 13 Wall. 537. No prior suit at law was necessary.

4. Appellant had no lease and no interest on the land. He had only a license. 27 Cyc. 690 b; 79 Pac. 1052-3; 66 Mo. 430; 97 Fed. 167; 54 Ark. 346; 48 *Id.* 264; 90 Fed. 379-383.

5. A subsequent lessee or licensee has no right to redeem from foreclosure. 9 Enc. Pl. & Pr. 345 (8); 347 note 2, 348.

6. The license has been revoked by the foreclosure sale.

### STATEMENT OF FACTS.

Some time prior to 1904 the Bolen-Darnall Coal Company were the owners in fee of coal lands in Oklahoma and Arkansas. During the year 1904 they executed a mortgage on these lands to secure a loan obtained from the Fidelity Trust Company of Kansas City, Missouri. On February 16, 1911, Bolen-Darnall Coal Company

(hereafter designated Darnall Company) entered into a contract with Thomas Harbottle, which is as follows:

"CONTRACT.

"This contract made and entered into this 16th day of February, 1911, by and between Bolen-Darnall Coal Company, party of the first part, and Thos. Harbottle, party of the second part, witnesseth:

"That the party of the first part agrees to permit the party of the second part to sink a slope on the land owned by the party of the first part in the town of Hartford, Sebastian County, State of Arkansas, about half way between the No. 2 mine of the party of the first part, and the Midland Valley Railroad, for the purpose of producing coal.

"It is expressly stipulated, understood and agreed by and between the parties of this contract, that all implements, timbers, cars, rails and mining material furnished by the party of the first part to the party of the second part, shall be and remain the property of the party of the first part, and at the expiration of this contract to return all such cars, rails and materials to the party of the first part in good condition, on top of the ground near the mouth of the slope.

"It is stipulated, understood and agreed that the party of the second part shall mine coal according to his own plans and methods, with two exceptions:

"First, the party of the second part agrees to protect the ventilation of mine No. 2, belonging to the party of the first part, by putting up and keeping in repair all doors and stoppings between the slope operated by him and mine No. 2 of the party of the first part.

"Second, the party of the second part agrees to mine coal only in places pointed out and designated by boundary lines as shown on map marked exhibit 'A' and made part of his contract as the places and coal which they are to mine under this contract; however, the Bolen-Darnall Coal Company, party of the first part, shall exercise no discretion whatever in the methods used by the

party of the second part in mining coal, nor in the control exercised by the party of the second part over the men mining coal for them.

"It is further stipulated, understood and agreed that in mining coal from this slope, that the party of the second part will commit no waste, nor wantonly injure the property of the party of the first part.

"It is further stipulated, understood and agreed by and between the parties of this contract, that the party of the second part agrees to sell to the party of the first part, at the option of the party of the first part, the entire output of the mine, and the party of the first part, if it exercises its option to buy said coal, shall pay for all mine run coal loaded from said mine, the sum of ............... per ton for all merchantable coal, railroad weights to govern, and said coal shall not contain more than 30 per cent. slack over 1⅛-inch screen eight feet long.

"If the party of the first part does not exercise its option to buy the coal from the party of the second part at the above price, and the party of the second part agrees to pay to the party of the first part, twice a month on regular pay days, ............... cents per ton royalty on all coal produced from said mine.

"It is also stipulated and understood that all orders for custom coal and all other coal shall come through the Bolen-Darnall Coal Company's office at Hartford, Arkansas, and payment thereof shall be made through said office.

"The party of the second part agrees to turn all entries in a proper and workmanlike manner, and to place all rails that are now in the first north entry, or may be in other north entries within the boundary lines of his lease, on top of ground at the expiration of this contract.

"The party of the first part agrees to furnish to the party of the second part ten pit cars in their present condition, and enough lumber and bolts for the proper repair of said pit cars and other machinery which he may have in his possession belonging to the party of the first part, in proper condition.

"The party of the second part agrees to mine and move all available coal as shown within the boundary lines on map marked exhibit 'A,' above referred to.

"Upon failure of the party of the second part to keep up the mine in a workmanlike manner for a period of ninety days, this contract shall be null and void, except such suspensions be caused by strikes or unavoidable accidents.

"Witness our hands this 16th day of February, 1911.

"Bolen-Darnall Coal Co.,

"By Jas. A. Bolen, Vice President,

"Party of the First Part.

"Thos. Harbottle,

"Party of the Second Part.

"Witnesses:

"M. K. McCoubrey.

"W. S. Sampson."

After the adoption of the Federal Judiciary act a suit was brought in the Federal Court of Oklahoma against the Darnall Company, in which all its property, including the coal lands in Arkansas, was placed in the hands of a receiver. An ancillary bill was filed also in the Federal Court of Oklahoma by the mortgagee for the foreclosure of its mortgage. A decree of foreclosure was rendered and the property of the Darnall Company, including its coal lands in Arkansas, was sold to Paxton and James, who received a deed to the property. Harbottle entered into possession and operated the mine under the terms of the contract, paying Darnall Company royalty for the coal that he took out and disposed of himself, or the Darnall Company received the coal from Harbottle and paid him a satisfactory price for the same. After the receiver was appointed Harbottle continued to operate the mine under the contract with the Darnall Company, but paid royalty to the receiver instead of that company. Harbottle was not made a party to the suit in the Federal Court for the appointment of a receiver and for the foreclosure of the mortgage.

On the 11th of April, 1917, James and Paxton, the purchasers of the land at the foreclosure sale, entered into an agreement to lease the coal lands in controversy to the Central Coal & Coke Company. On the 14th of June, 1917, that company instituted this suit against Harbottle, in the chancery court of Sebastian County, alleging in its complaint that it had leased the lands in controversy (describing them) from Paxton and James, who were the owners thereof and who were also made plaintiffs. It was alleged in the complaint that the Darnall Company, while operating a coal mine upon the property, had left mine pillars of coal standing to prop the roof of the mine; that Thomas Harbottle, without any right or authority, was removing these coal pillars and had been requested to desist therefrom and had refused to do so; and that, unless he was restrained from removing the pillars and coal, the roof would fall in and prevent plaintiff from removing its coal from the mine or from going through the mine which Harbottle was operating under his contract, to remove coal from plaintiff's mine adjacent; that the acts of Harbottle in thus removing the pillars and coal was daily and continuous; and that plaintiff had no adequate remedy at law, and unless Harbottle was enjoined that the plaintiffs would suffer irreparable injury. They prayed for temporary restraining order, and upon a final hearing for a perpetual injunction.

Harbottle filed a demurrer setting up that the court was without jurisdiction because the plaintiff had an adequate remedy at law, and also that the plaintiffs had not alleged a title at law and that the plaintiff did not allege that the defendant was insolvent. The defendant, Harbottle, without calling for a ruling of the court on the demurrer, answered, denying the material allegations of the complaint, and alleged that he was in possession of the lands under a contract with the Darnall Company, the original owners, which contract was placed on record on the 5th of April, 1913. He averred that he had a right under his contract to continue mining coal on this land until same had been removed; that he had been operating

under the terms of the contract (which he designated as a lease) from the date of its execution until he had been temporarily enjoined; that he had not been made a party to any foreclosure proceedings; that by reason of his lease from the Darnall Company he had an estate in the land described and the coal therein and was therefore entitled to right of redemption. He offered to pay what might be necessary to redeem the lands and asked that the court order a new foreclosure in order that he might be made a party and be allowed to redeem. He alleged that he had been damaged in the sum of $50 per day since the injunction, and if the temporary injunction were continued in force he would be prevented from extracting 30,000 tons of coal which he had opened up and to accomplish which he had expended large sums of money; that he had a market for the coal which he could mine under existing contracts, and consequently would suffer great and irreparable injury if the injunction were made perpetual. He asked that the temporary injunction be dissolved, and that he be awarded costs and damages.

Much testimony was taken which it becomes unnecessary for us to set forth and discuss in view of the conclusion we have reached concerning the proper construction to be given the contract under which Harbottle claims.

The trial court found that Harbottle was not entitled to mine or remove any coal from the lands in controversy and that all his rights under his contract with the Darnall Company had ceased; that he was not entitled to redeem from the mortgage foreclosure and entered a decree granting plaintiff a perpetual injunction. This appeal seeks to reverse that decree.

WOOD, J., (after stating the facts). (1) The appellant is not in an attitude to object to the jurisdiction of the court even if the complaint had failed to state a cause of action, because the appellant did not call for a ruling of the court on his demurrer, but, on the contrary, waived all objections to the jurisdiction by filing a cross-bill asking for affirmative relief and upon the issues thus

joined proceeded to final adjudication. See *Kiernan* v. *Blackwell,* 27 Ark. 235; *Greer* v. *Vaughan,* 96 Ark. 524; *Pollack* v. *Steinke,* 100 Ark. 28; *Pratt* v. *Frazer,* 95 Ark. 405; *Plunkett* v. *State Natl. Bank,* 90 Ark. 86.

(2)   While the allegations of the appellees' complaint as to ownership are sufficiently denied in the appellant's answer to raise that issue, yet the undisputed evidence in the record shows that the appellees James and Paxton were the owners and had contracted to lease the lands in controversy to the appellee Central Coal & Coke Company, and that the latter was entitled to the possession thereof, unless the appellant's contract with the Darnall Company gave him some interest or estate in the land which would constitute him a junior encumbrancer with the right to redeem.

(3)   Appellant's right, if he has any to defend, or to affirmative relief, is predicated entirely upon the written contract which he designates in his brief as a lease. We are unable to discover after a most critical analysis of the language of this instrument that it bears any indicia of a lease.

"An estate for years," says Mr. Washburn, "is one that is created by a contract technically called a lease whereby one man called a lessor lets to another called the lessee the possession of lands or tenements for a term of time fixed or agreed upon by the parties to the same." 1 Washburn on Real Property, § 608.

"Lease is a conveyance of lands or tenements to a person for life, or years, or at will, in consideration of a return of rent or recompense." 1 Devlin on Real Estate, § 13.

"A lease is a contract by which one person divests himself, and another takes possession of lands or chattels for a term, whether long or short." Wood, Landlord & Tenant, § 203. See also Cruise Digest, tit. "Lease;" Words and Phrases, "Lease," page 56 *et seq.*

While the term "lease" is one of technical import, yet no specific words are necessary to create or describe the relation of lessor and lessee, but words must be used

which have the effect to divest the owner or lessor of the possession and right to the possession, and which invests the lessee with the subject-matter of the lease, for the term contemplated by the contract, whether long or short. True, the words "his lease" occur once in the contract under review, but these words, when taken in connection with the immediate context and with all the other words of the instrument, do not have any effect in fixing its legal character. When the instrument is construed as a whole, it contains all the elements of a license, but none of the characteristics of a lease. "A license is a personal, revocable and nonassignable privilege conferred either by writing or parol to do one or more acts on land without possessing any interest therein." Words & Phrases, "License," page 116 *et seq.*

In *Joplin Supply Co.* v. *West,* 149 Mo. App. 78-93, it is said: "There is a marked difference between a license and a lease. In a lease the right of possession against the world is given to the tenant, while a license creates no interest in the land but is simply an authority or power to use in some specific way."

Judge Burnett, speaking for the court of the Third Appellate District of California, gives a very accurate definition of license, and a very clear test for determining the difference between a license and a lease as follows: "A license in respect to real estate is an authority to do a particular thing upon the land of another without possessing an estate therein. The test to determine whether an agreement for the use of real estate is a license or a lease is whether the contract gives exclusive possession as against all the world, including the owner, in which case it is a lease, or whether it merely confers a privilege to occupy under the owner, in which case it is a license." "This," he adds, "is a question of law arising out of the construction of the instrument under which a lease or a license may be created."

In *Wheeler et al.* v. *West et al.,* 71 Cal. 126, 11 Pac. 871, it is said: "There is a broad distinction between a lease of a mine, under which the lessee enters into pos-

session and takes an estate in the property, and a license to work the same mine. In the latter case the licensee has no permanent interest in the property, or estate in the land itself, but only in the proceeds, and in such proceeds, not as realty but as personal property, and his possession, * * * is the possession of the owner.''

Now, when the instrument under consideration is subjected to the above definitions and test, it will be observed that it does not vest any interest whatever in the freehold for any length of time in the appellant. It does not confer upon appellant the exclusive right to the possession of the lands in controversy; it only gives him the right to enter upon the land at a certain designated place and to remove coal from certain designated places which were shown on a map that was made a part of the contract. The places thus designated were separated by areas which appellant had no license to mine but which he had only the right to pass over in order to reach the places that were embraced in his license. There is not one word in the contract to indicate that the appellant was to have an estate or interest in the land or in the coal until he had mined the same. The Darnall Company does not surrender to appellant the exclusive right of possession.

The writing under consideration certainly did not create the relation of landlord and tenant, and the duties and obligations growing out of it were entirely personal to the parties to the contract. The appellant had no right that he could transfer to another. Since no estate or interest in the land was vested in appellant by the contract, the mortgagee in the foreclosure proceedings was not bound to take notice of his possession and to make him a party. Whatever may have been his rights or remedies as against the Darnall Company, the mortgagor, they were acquired subsequent to the mortgage and the character of these rights was not such as to constitute him in any respect a junior encumbrancer with an equity of redemption.

Counsel for appellant assume that the writing is a lease, and therefore an encumbrance upon the land. They

cite and rely upon the cases which hold to the general doctrine that one who has an interest in land and would be a loser by a foreclosure proceeding has a right to redeem.

Having decided that the instrument does not vest appellant with any interest in the land, of course these authorities are not applicable, and we know of no authority for holding that the mere licensee of a mortgagor has any right of redemption.

It follows that the decree of the court is correct, and it is, therefore, affirmed.