Cite as 2024 Ark. 3

# SUPREME COURT OF ARKANSAS
No. CR-23-265

|  |  |
|---|---|
| | **Opinion Delivered:** January 18, 2024 |
| FRED KIMBALL, SR. | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO. 04CR-20-2282] |
| APPELLANT | |
| V. | HONORABLE ROBIN F. GREEN, JUDGE |
| STATE OF ARKANSAS | |
| | AFFIRMED. |
| APPELLEE | |

**BARBARA W. WEBB, Justice**

A Benton County jury convicted Fred Kimball, Sr., of two counts of rape, for which he received two concurrent life sentences. For his sole point on appeal, he argues that the court should reverse and dismiss these convictions because the statute of limitations barred the prosecution. We affirm.

## I. *Statute of Limitations*

In a criminal prosecution, the State must prove beyond a reasonable doubt that the statute of limitations has not expired. Ark. Code Ann. § 5-1-111(a)(4) (Repl. 2013). Kimball raped his granddaughters between the years 1997 and 2004. The statute of limitations in effect when Kimball committed his crimes allowed for prosecution up to the victim's twenty-fourth birthday, regardless of the victim's age at the time of the offense, if the offense is not reported to the police or a prosecutor. Ark. Code Ann. § 5-1-109(h)(7) (Supp. 1987).

In 2011, that period was extended to permit prosecution up until the minor victim turned twenty-eight years old. Ark. Code Ann. § 5-1-109(a)(2)(A) (Supp. 2011); Acts 2011, No. 1127 § 1. In 2013, the statute was amended to allow the prosecution for rape committed against a minor victim to be commenced at any time. Ark. Code Ann. § 5-1-109(a)(1)(D) (Repl. 2013); Acts 2013, No. 144, § 1.

Regarding the changes in the statute of limitations, we have held that no one has a vested right in a statute of limitations until the bar of the statute has become effective. *Reeves v. State*, 374 Ark. 415, 288 S.W.3d 577 (2008). Accordingly, the General Assembly may validly enlarge the period of limitations and make the new statute apply to a cause of action that has not been barred at the time the new statute becomes effective. *Id*. However, if the action is already time-barred when the new statute becomes effective, the General Assembly may not revive a cause of action. *Id*. As applied to the case-at-bar, the charges against Kimball would be time-barred only if Kimball's crimes had been reported to law enforcement before the General Assembly amended section 5-1-109(a) in 2011 and 2013.

## II. *Facts*

Kimball was charged by information with the rape of three girls, VC, MK, and LB, prior to 2010. All the alleged victims are Kimball's granddaughters, and all the girls were under the age of fourteen at the time. VC was born in July 1990; MK was born in May 1993; and LB was born in May 1994. Specifically, the information alleged that Kimball engaged in sexual intercourse or deviate sexual activity with VC; deviate sexual activity with MK, by digitally penetrating her vagina; and engaged in sexual intercourse or deviate sexual activity with LB.

2

The issue of whether Kimball's crimes were time-barred was tried by the court prior to his jury trial. Although Kimball filed a motion to dismiss, it was the State's burden to disprove his affirmative defense. At the April 29, 2011 hearing, the State called all three alleged victims to testify. It also called Richard Wells, a retired detective from the Benton County Sheriff's Department, who is also Kimball's nephew, and Detective Michael Braswell, who was tasked in 2020 with the investigation that led to the filing of charges against Kimball. Kimball called no witnesses but did submit two exhibits: a copy of Arkansas Code Annotated section 5-1-109(h)(7) (Supp. 1987), the relevant limitations statute that was in effect when the crimes were allegedly committed, and a document from the Children's Advocacy Center (CAC) that reflected, in pertinent part, that Detective Jeremy Felton was the investigating officer who had referred MK for a forensic interview.

MK testified that she was sexually assaulted by Kimball on one occasion between 2003 and 2005, when she was between eight and ten years old. She stated that the day after it happened, she told her sisters about the incident and they told her to talk to her parents. Her parents did nothing. However, MK further testified that she later mentioned it to her friend when she was twelve or thirteen years old, and she went to an interview at the CAC. She claimed that she told the interviewer that she "just made it up because [she] was upset with [her] grandparents because they were mean and grouchy." MK claimed that after the interview, she did not mention the alleged abuse to anyone until she posted about the incident on Facebook in 2020. The post led to an investigation conducted by Detective Braswell. MK claimed that Detective Braswell was the only law enforcement officer that she spoke to about the alleged abuse. She also denied speaking to anyone from the Arkansas

3

Department of Human Services (ADHS). She likewise asserted that she had no knowledge of her sisters speaking to law enforcement prior to being contacted by Detective Braswell. MK acknowledged that she told Detective Braswell that her sister LB had spoken to someone at her school about Kimball's alleged abuse. According to MK, she never met Richard Wells, and she never spoke to Detective Felton.

LB testified that she was assaulted by Kimball "over a period of time" between the years 1999 and 2003, when she was seven to nine years old. She claimed she told her parents but denied talking to any law enforcement officer prior to her interview with Detective Braswell. LB recalled that she spoke with "somebody" at school, when she was eight years old. However, she did not remember who the interviewer was, and she had no specific recollection about that person being in law enforcement. LB admitted that she knew Richard Wells as her father's cousin but specifically denied talking to him about the alleged assaults.

VC testified that she had been assaulted by Kimball prior to 2003. At that time, when she was thirteen years old, she and her sisters told her parents what Kimball had been doing to her. VC claimed, however, that she was unaware of any investigation by law enforcement prior to her interview with Detective Braswell in 2020. According to VC, she had no direct knowledge regarding whether her sisters had spoken to law enforcement or ADHS prior to the investigation conducted by Detective Braswell.

On cross-examination, VC acknowledged that she told Detective Braswell that "the officer, who was a family member, was called to the school and interviewed one of [her] sisters." However, she dismissed the statement as just something she "had heard through the

4

family" and of which she had no firsthand knowledge. Kimball's trial counsel also played a "snippet" of VC's recorded interview with Detective Braswell:

VC: Referring to -- I really don't know how close it was together.

DB: Yeah. Yeah.

VC: And that how friend's family reported it also to DHS.

DB: Okay.

VC: And we all had to go and talk with them and the same thing, we were told we had to lie.

DB: By (unintelligible).

VC: My dad, yeah.

DB: Okay.

VC claimed that the "them" she was referring to was her grandparents, not ADHS as Kimball's trial counsel asserted.

Richard Wells testified next. He stated that he is a retired detective, having served with the Benton County Sheriff's Department. He also stated that he is Kimball's nephew. He recalled that in 2006, he was assigned to investigate allegations that Kimball had sexually assaulted one of his granddaughters. He recognized that he had a "conflict of interest" and immediately passed the case to another detective, Jeremy Felton. According to Wells, he had no involvement in the investigation. He did, however, recall that at a family Easter function, he heard MK's father, whom he called "Bub," "ranting" about what Kimball had done to his daughter. Wells stated that he informed Detective Felton about the "rant." Wells further testified that in the normal course of an investigation of sexual abuse, the child would be taken to the CAC for an interview; and if there were multiple alleged victims, all of them

5

would be interviewed. Nonetheless, Wells denied knowing whether any of the three girls had been interviewed by law enforcement. On cross-examination, Wells testified that at the Easter event, Bub said "[H]ell, he's probably done this to all of them." And at the same event, someone asked, "[W]hat about the other girls?" and Bub responded, "[L]ike, who knows?" Wells admitted that he had no knowledge about whether Detective Felton drafted a report on the investigation, but stated, "I just can't imagine him not doing one because the girl went to the CAC."

Kimball's trial counsel asked the court to recess the hearing so that the State could provide him with reports detailing the State's investigation of allegations that Kimball had sexually abused his granddaughters. The circuit court avoided ruling, accepting the State's contention that its final witness, Detective Braswell, would be the proper witness to inquire about such reports.

Detective Braswell testified that the CAC sent him a 2006 videotaped interview of MK and an interview form in response to his request for all records involving each girl. Finding that Detective Felton had referred MK to the CAC for a forensic interview, he searched for a report by Detective Felton but found nothing pertaining to sexual assault by Kimball. He opined that the absence of the report, despite there being a CAC interview, could be ascribed to his department having "different software installed since then." He also talked to Detective Felton, who claimed that he did not recall anything about this case. Kimball did not press the circuit court for a ruling on his oral motion to recess the hearing.

At the conclusion of the testimony, Kimball argued that the case involving all three victims should be dismissed because the statute of limitations had run. He asserted that the

6

plain language of the statute in effect at the time required only that the crime be reported to law enforcement, not that the victims themselves do the reporting. Further, he asserted that the statute does not require that law enforcement make a good faith effort to investigate those allegations; "simply having knowledge and having been reported that there is an allegation is what triggers this statute." Kimball asserts that the "clearest example" of this interpretation exists with respect to MK. He stated that the allegation was reported to law enforcement, law enforcement referred it to the CAC, and when she was given the awful direction to lie, it died on the vine and it didn't go anywhere, "but that triggers this statute." With regard to LB, Kimball noted that Richard Wells relayed what Fred's rantings were to Jeremy Felton when he handed over that case, so Felton was on notice that an allegation of sexual assault could have been made with regard to the other granddaughters. Kimball then pointed to the disputed "snippet" of VC's interview with Detective Braswell and asserted that it was proof that all the victims had spoken with ADHS. Significantly, Kimball's argument was grounded in how he wished the circuit court to interpret the testimony and the CAC document indicating that Detective Felton had referred MK for a forensic interview. He made no argument concerning any deficiencies in the State's proof.

The State responded that, throughout this case, no one made an allegation of rape against Kimball until 2020. It noted that even the referral to the CAC involved an allegation of "inappropriate touching." Regarding VC and LB, it asserted that there was no evidence that either spoke with law enforcement. Addressing the allegations involving MK, the State acknowledges that she was interviewed at the CAC and that the Benton County Sheriff's Office was involved inasmuch as Detective Felton provided a referral. However, the State

7

contended that MK telling her parents, Detective Wells overhearing something at a family gathering, and MK telling her friend about what had happened to her is not a report to a law enforcement agency. The State noted the anonymous call to the sheriff's office that opened the case but argued that it was "not enough of a report" to trigger the statute.

The circuit court expressed an inclination to deny Kimball's motion to dismiss. Kimball, however, convinced the circuit court to reconsider, citing Wells's testimony that he had initially been assigned the case, and that cases did not exist without a report to a law enforcement agency. The circuit court dismissed the charges involving MK but denied the motion to dismiss as to the charges involving LB and VC.

The remaining counts went to trial, and the jury convicted Kimball of raping VC and LB. Kimball does not challenge the sufficiency of the evidence sustaining those convictions. His argument on appeal focuses solely on the circuit court's denial of his motion to dismiss the underlying charges.

### III. *Standard of Review*[1]

We review a circuit court's denial of a motion to dismiss a criminal case on statute-of-limitations grounds under the abuse-of-discretion standard. *Reeves*, *supra* (citing *Biggers v.*

---

[1]Regarding the standard of review, we agree with the State that abuse of discretion is proper. However, Kimball asks the court to adopt a less deferential standard of review. He cites two cases in which the statute of limitations was raised in directed-verdict motions but contends that "it makes sense to import the directed-verdict standard when the vehicle to raise the statute of limitations concern is by way of motion for directed verdict." However, he asserts that "here we have here a decision following a bench trial, which would implicate the clear-error standard." *Baugh v. State*, 2021 Ark. App. 400, at 2 (citing *El Paso Prod. Co. v. Blanchard*, 371 Ark. 634, 269 S.W.3d 362 (2007)). He notes further that at issue is a question of subject-matter jurisdiction, which he contends "should be reviewed de novo." *See Young v. Norris*, 365 Ark. 219, 221, 226 S.W.3d 797, 799 (2006) ("[A] statute of limitations issue 'implicates jurisdiction to hear the case and cannot be waived' in a criminal

*State*, 317 Ark. 414, 878 S.W.2d 717 (1994)). For the circuit court to have abused its discretion with regard to a motion to dismiss, it must have acted improvidently, thoughtlessly, or without due consideration. *Null v. Ark. Parole Bd.*, 2019 Ark. 50, 567 S.W.3d 482.

## IV. *Argument on Appeal*

For his sole point on appeal, Kimball argues that we should reverse and dismiss his convictions because the statute of limitations barred the prosecution. He asserts that the crimes he was charged with took place no later than 2003, and the statute of limitations in effect lapsed six years later because the State failed to prove beyond a reasonable doubt that a report had not been made. Kimball asserts that the circuit court "reversibly erred" by failing to account for the undisputed fact that a report as to "all of the girls" had been relayed to the investigator in charge back in 2006. The "report" that Kimball is referring to is Wells overhearing the girls' father, Bub, saying "[H]ell, he's probably done this to all of them." And at the same event, "someone" asking Bub, "[W]hat about the other girls?" and his reply, "[W]ho knows?" Kimball argues that each statement, conveyed by Wells to Detective Felton in the course and scope of his role as law enforcement officer, "commands" a finding that a report was made to a law enforcement agency.  Kimball further argues that LB had

---

matter.") (quoting . *Gardner v. State,* 76 Ark.App. 258, 262, 64 S.W.3d 761 (2001)); *Ark. Dep't of Fin. & Admin. v. Carroll Cnty. Holdings, Inc.*, 2022 Ark. 128, at 3 ("Where the issue of subject-matter jurisdiction requires interpretation of a statute or constitutional provision, our review is de novo.").

We believe that Kimball fails to grasp the meaning of judicial discretion. Here, discretion lies in the circuit court's finding of the predicate facts. In the case before us, if the circuit court found that Kimball's crimes had been reported to law enforcement before the statute was amended, then the statute would have run and the circuit court would be obligated to dismiss the charges. Such was the case in the charges involving MK. However, not finding a similar report for the other victims, the circuit court did not abuse its discretion in refusing to dismiss the charges.

undeniably made her allegation to "somebody" at the school, and it was therefore clearly erroneous for the circuit court to disregard the undisputed testimony. Kimball acknowledges LB's testimony that she could not recall "who it was." Nonetheless, he asserts that the sole evidence was that the "somebody" was "an officer."

Additionally, Kimball claims that the circuit court "reversibly erred" by shifting the burden from the State to the defense. Kimball asserts that it was the State's burden to show that no report had been made, and the circuit court erred in failing to dismiss—purportedly because the defense failed to disprove the State's case. Kimball argues further that it was reversible error for the circuit court to credit the State's position that "absence of evidence was evidence of absence."

Regarding Kimball's assertion that the circuit court impermissibly shifted the burden to him, he argues that to prove beyond a reasonable doubt that no report had been made, the State should have put on evidence by records custodians for the Benton County Sheriff's Office, the Rogers Police Department, the Avoca Police Department, the Department of Human Services, and the Children's Advocacy Center that a diligent search had been performed for records with any of the names "Fred Kimball," "Rebecca Kimball," and all of the maiden names of the victims as well as "Jeremy Felton," or "Richard Wells." Further, he asserts that any "software issues" should have been comprehensively addressed to rule out the possibility that a report had been made and then either lost by a failure of good document-retention practices or destroyed when it became inconvenient to the State. Additionally, he asserts that Detective Felton should have been subpoenaed and should have adduced positive testimony that no report had been made. It was not enough to relay a

hearsay "I don't recall" through the appearing investigator. Kimball also asserts that Detective Braswell should have undertaken reasonable efforts to locate the "somebody" that LB admittedly made a report to, and if he could not find the "somebody" to provide testimony or sufficient circumstantial evidence "to rule out any possibility that the "somebody" was not law enforcement.

We hold that the circuit court did not abuse its discretion in refusing to dismiss the charges involving Kimball's rape of LB and VC. First, all three victims testified unequivocally that they did not speak to law enforcement prior to Detective Braswell's involvement in the case in 2020. While it is true that both Wells and Detective Braswell testified that there was an investigation into Kimball's sexual assault of MK, neither Wells nor Detective Braswell recalled that the investigation ever extended to VC and LB. The CAC report entered into evidence was duly considered by the circuit court, and the circuit court contemplated the possibility that a corresponding police report concerning MK was possibly lost in a software change. While this supported the circuit court's discretion to dismiss the charges involving Kimball's abuse of MK, it did not compel a conclusion that abuse of the other victims had been reported. We likewise reject Kimball's contention that VC's statement in her interview with Detective Braswell was proof that LB reported to an officer at her school that Kimball had sexually assaulted her. Here Kimball is referring to VC's statement in her interview with Detective Braswell that the person LB reported the abuse to was Wells, an assertion that VC herself largely disavowed in her testimony at the hearing.

Likewise, we reject Kimball's argument that Bub's "rant," overheard by Wells, constituted a report to law enforcement. The statements themselves confess a lack of

definitive knowledge of a specific crime or a specific victim. The circuit court's interpretation of the rant as not constituting a report to law enforcement was well within its sound judicial discretion. Last, Kimball's argument that the circuit court impermissibly shifted the burden to him was not raised and ruled on by the circuit court, so it is not preserved for our review. *Gooch v. State*, 2015 Ark. 227, 463 S.W.3d 296.

Finally, we note that, arguing in the alternative, Kimball states that we should reverse and remand for a new trial on whether a report had been made. In his new trial, Kimball contemplates being able to present "*Brady* evidence"—meaning the reports by law enforcement that were not produced for the hearing. However, this argument was also not raised or ruled on in the circuit court and therefore is not preserved for our review. *Gooch*, *supra*.

## III. *Rule 4-3(a) Review*

Because Kimball received a sentence of life imprisonment, the record has been reviewed for all errors prejudicial to him, as required by Arkansas Supreme Court Rule 4–3(a). In our review of the record before us, we have found no reversible error.

Affirmed.

*Matt Kezhaya* and *Sonia Kezhaya*, for appellant.

*Tim Griffin*, Att'y Gen., by: *A. Evangeline Bacon*, Ass't Att'y Gen., for appellee.